**Charles MANSUR and Betty Jo Mansur, et al., Plaintiffs/Appellants,**

v.

**The TRUSTEES OF HICKORY HILL, PLAT 3, Defendants/Respondents.**

**No. 65823.**

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 28, 1995.

Rehearing Denied April 3, 1995.

Stephen Robert Clark, St. Louis, for plaintiffs/appellants.

Timothy J. Tryniecki, Michael F. Roche, St. Louis, for defendants/respondents.

PUDLOWSKI, Judge.

Landowners appeal an order denying their claims for damages and for a declaratory judgment that the trustees of their subdivision have a duty to maintain the walls of an open storm water sewer running across their land. The trial court held that the original indenture agreement contained no such duty. We reverse and remand.

The owners of lots 1 and 2 of Plat 3 of the Hickory Hill subdivision in Frontenac, St. Louis County, initiated this action against the subdivision's trustees for breaching their duties outlined in the original indenture agreement. The owner and developer of the subdivision recorded the Plat 3 map on February 15, 1956. On that same day, it recorded an indenture agreement creating, *inter alia,* easements and a board of trustees with certain duties:

> WHEREAS, the Party of the First Part has subdivided the above described property into lots, the subdivision to be known as Hickory Hill Plat 3, which lots are to be used for residential purposes and has created streets and easements upon, through, over, under and across the said property for public utilities, for underground sewer drains and for surface drainages, and for any other/purposes [sic] or uses necessary or desirable for the enjoyment of said property; and

> WHEREAS, it is the desire of the Party of the First Part to provide for a means of maintaining said sewers and other utilities and streets, parkways, fences and entrances if and when necessary in said Hickory Hill Plat 3, and of an effective means of enforcing the restrictions hereinafter set forth, and of maintaining the general appearance of said lots in said Hickory Hill Plat 3,

> NOW, THEREFORE, ... the Party of the First Part does hereby constitute the Parties of the Second Part Trustees for it and for any and all lot owners who may hereafter purchase lots in Hickory Hill Plat 3.

> The title to the streets shown on the Plat ... and all easements on said Plat is [sic] hereby conveyed to Robert M. Berkley, Charles F. Berkley and Helene S. Berkley, as Trustees, and to their successors in trust, and shall be devoted to the use and benefit of the present and future owners of Lots in said Subdivision....

> The said Trustees are appointed for the following purposes and under the following terms and conditions and all lots in Hickory Hill Plat 3 shall be subject to the liabilities imposed by this instrument.

> *One* It shall be the duty of said Trustees to maintain any fire plugs and street lights and to maintain, reconstruct, and keep in good repair, all streets, sewers, both storm and foul water, in Hickory Hill Plat 3, and maintain any entrance gates, fences parkways, etc. All money for such maintenance, repair or reconstruction of streets, fences, entrance gates, parkways, utilities, sewers, easements, etc., shall be procured by the Trustees in the form of assessments as hereinafter set forth....

The storm sewer in question is located in an easement running across lots 1, 2, 3, and 40. It carries runoff water from Plat 3, as well as other land. At some time in the early 1950's, prior to the recording of the indenture agreement, the storm sewer ditch, which once resembled a winding creek, was straightened at lots 1 and 2. No evidence was produced which described the walls or lining of the sewer at or prior to February 15, 1956, the date the agreement was recorded.

However, the former owner of lot 8 testified that when he moved to the subdivision in 1957 the storm sewer across lots 1 and 2 was lined with railroad ties. The present owner of lot 2, a plaintiff in this action, also testified that the straightened portion of the sewer running across lots 1 and 2 was lined with railroad ties when he moved in during June of 1958, and remains lined with ties today.

The owner of lot 2, Charles Mansur, has Master degrees in civil and geo-technical engineering, and has been involved with the

building of many locks and dams for the U.S. Army Corps of Engineers. Upon noticing that the portion of the sewer running across his front yard was deteriorating, he took the initiative to remedy the problem. Mr. Mansur was, at the time, a trustee of the subdivision. He sent a letter to the other trustees, dated January 4, 1964, requesting reimbursement for expenses. The trustees paid Mr. Mansur $153 on August 9, 1964. Subsequently, Mr. Mansur organized and supervised the repair of the portion of the sewer in front of his neighbor's house at lot 1. The August 17, 1964, bill for the repairs at lot 1 included $100.75 for railroad ties and was paid by the trustees. In later years, the trustees initiated numerous repairs on the storm sewer at lots 1 and 2, including the years 1977, 1982, and 1984. The trustees expended at least $9,381 on these repairs.

From 1984 to the present, however, the trustees have refused to make or pay for any repairs. From July, 1986, through December, 1988, Mr. Mansur spent $2,850 of his own funds on repairs. His former neighbor, Mr. Faron, a former owner of lot 1 and a plaintiff in this action, spent $5,610. Mr. Mansur, who was recognized as an expert by the court, testified that if these repairs had not been completed, the straightened section of the storm sewer, running across lots 1 and 2, would have meandered back towards its natural course, scouring out major sections of their front yards. This expert testimony was not controverted by the defense.

Mr. and Mrs. Mansur and Mr. Faron, along with the present owners of lot 1, Mr. and Mrs. Barnhart, commenced this suit in the St. Louis County Circuit Court in 1991, seeking reimbursement for their expenditures and a declaratory judgment that the trustees have a duty to maintain the sewer, including the tie wall lining.

On February 10, 1994, the trial court issued a judgment against the landowners and for the trustees. It reasoned that although the trustees have a duty to maintain the sewer, they only have a duty to maintain the sewer as it existed at the time of the indenture agreement of February, 1956. Because there was no evidence that the sewer at that time had a tie wall lining, and because the tie wall lining is not necessary to the functioning of the sewer, the trustees have no duty to maintain the tie wall lining. Plaintiffs, on appeal, challenge this rationale. We review in accordance with the standards of Rule 73.01(c).

Whether or not the tie wall lining existed at the time of the original indenture, the trustees had an unmistakable duty to "maintain, reconstruct, and keep in good repair, all ... sewers, both storm and foul water, in Hickory Hill Plat 3." The question presented is whether maintaining, reconstructing and repairing the sewer entails maintaining, reconstructing and repairing the tie walls.

We acknowledge that plaintiffs have not proven that the tie walls were a part of the sewer at the time of the original indenture. The evidence only attested to the presence of ties from 1957 onward, and not to their presence in 1956, the time of the indenture agreement.

However, the strong weight of the evidence suggests that even if the tie walls were not a part of the sewer at the outset, the walls were instrumental in "maintaining" the sewer. The meaning of an ambiguous term in a deed of restrictions may be found by looking at the subsequent actions of the parties. *Phillips v. Schwartz*, 607 S.W.2d 203, 207 (Mo.App.1980). From 1964 to 1984, the trustees faithfully fulfilled their duty to maintain the sewer. They accomplished this by maintaining the tie walls.

Where the parties themselves have placed a knowledgeable, uniform, consistent and long-time construction upon the provisions of an ambiguous contract, such a construction is persuasive and ordinarily will be accepted by the courts. (*Leggett v. Missouri State Life Insurance Company*, 342 S.W.2d 833, 852 (Mo. banc 1960)).

The trustees maintained the sewer through the use of railroad tie walls for a period of twenty years. Had they not done so, the straight portion of the sewer would have meandered back into its winding, natural course, as it was eroding the front lawns of lots 1 and 2. We find that the term "maintaining" included such construction and maintenance as was necessary to keep the sewer in its straight course at the time of the original indenture. The tie walls were quite apparently a means to that end.

The trial court wrongfully assumed that as long as a sewer carries water, it should be considered sufficiently maintained despite the course it might take or the property damage it might cause. Such a narrow construction is belied by the long-term actions of the parties, who have spent thousands of dollars to maintain the sewer in a straight course, thereby, preserving the front yards of lots 1 and 2.

The trial court placed emphasis on the facts that lot 3 did not have a tie wall until the lot owner built one with his own funds in 1959, and that lot 40 still has no tie wall. From this, the court drew the erroneous conclusion that tie walls were not contemplated in the original indenture, and are unnecessary on lots 1 and 2. This rationale overlooks a crucial difference between lots 3 & 40, and lots 1 & 2. The path of the storm ditch on lots 1 & 2 was artificially straightened in the early 1950's, some time before the indenture agreement; whereas, lots 3 & 40 remain in their natural, winding course to this day. Uncontroverted expert testimony revealed that the velocity of the water and its tendency to erode are much greater in the artificial channel across lots 1 & 2. Thus, the lack of tie walls on lots 3 & 40 is irrelevant to the necessity of tie walls on lots 1 & 2.

This opinion does not purport to hold that maintaining the railroad tie walls is the best, or the only acceptable way for the trustees to fulfill their duty to maintain the sewer in its present course. There was some testimony introduced at trial that there are better, or less expensive ways to maintain a sewer, e.g., walls of concrete, and we deem it in the province of trustees to consider such other options.

For the aforementioned reasons, we reverse the judgment of the trial court and remand to that court for a consideration of damages and a declaratory judgment in accordance with this opinion.

Cause reversed and remanded.

SMITH, P.J., and WHITE, J., concur.